LOVING et al. v. HAZELWOOD et al.*
(No. 932.)

(Court of Civil Appeals of Texas. Amarillo. Feb. 23, 1916. Rehearing Denied March 22, 1916.)

1. JURY ⬡⟿19(1) — RIGHT TO JURY TRIAL — LUNACY PROCEEDINGS.

A jury trial in lunacy proceedings either in the probate court or in the district court on appeal was part of the judicial system at the time of the adoption of the Constitution in 1876, and was guaranteed by article 1, section 15 thereof, providing that the right of trial by a jury should remain inviolate.

[Ed. Note.—For other cases, see Jury, Cent. Dig. §§ 104, 113, 120, 127–131, 133; Dec. Dig. ⬡⟿19(1).]

2. JURY ⬡⟿33(1) — LUNACY INQUISITION — STATUTE—"JURY" TRIAL.

The commission for trial of charges of lunacy provided for by Acts 33d Leg. c. 163, which is to be appointed by the probate judge to consist of three members, as many of whom as possible shall be physicians, and each of whom shall have the power to administer oaths, compel attendance of witnesses and punish them for contempt, which commission need not remain together, but a majority of whom must be present at any hearing and each member must personally examine the respondent, and which must make a report agreed to by a majority of the members, is not a "jury," and the law is therefore void as violating constitutional guarantee of jury trial.

[Ed. Note.—For other cases, see Jury, Cent. Dig. §§ 226, 227; Dec. Dig. ⬡⟿33(1).

For other definitions, see Words and Phrases, First and Second Series, Jury.]

3. INSANE PERSONS ⬡⟿51 — BOND FOR CUSTODY—VALIDITY.

The bond given to secure the release of one adjudged a lunatic under the void act of 1913 (Acts 33d Leg. c. 163), the condition of which was that the obligors will restrain and take care of the lunatic and have him placed under treatment, and which by the terms of the statute renders the obligors liable for damage done by the lunatic, cannot be given effect as a common-law bond to render the obligors liable for such injuries.

[Ed. Note.—For other cases, see Insane Persons, Cent. Dig. § 83; Dec. Dig. ⬡⟿51.]

4. INSANE PERSONS ⬡⟿51 — BOND FOR CUSTODY—VALIDITY.

Since the bondsmen who secured the release of an adjudged lunatic under the provision of the void act of 1913 (Acts 33d Leg. c. 163) cannot, because of the invalidity of the statute, surrender the lunatic to the sheriff or to an asylum, and thereby be released as provided by statute, part of the consideration for the bond is void, and since it cannot be separated from the good consideration, the whole bond is void.

[Ed. Note.—For other cases, see Insane Persons, Cent. Dig. § 83; Dec. Dig. ⬡⟿51.]

Appeal from District Court, Potter County; Hugh L. Umphres, Judge.

Action by Mrs. Frances Loving and others against R. R. Hazelwood and others. Judgment for the defendants on demurrer to the petition, and plaintiffs appeal. Affirmed.

C. E. Gustavus, of Amarillo, for appellants. Boyce & Davidson, Veale & Davidson, and Crudgington & Works, all of Amarillo, for appellees.

HENDRICKS, J. The Acts of the Thirty-Third Legislature of 1913, c. 163, in regard to proceedings in lunacy, provide that, upon an affidavit, charging that a certain person is insane, the county judge shall issue a writ for the apprehension of such person and the cause is docketed as an ex parte proceeding on the probate docket of said court. The judge appoints a commission composed of six persons to inquire into the charge of lunacy and in counties of a population of less than 5,000, one of the members of the commission shall be a physician; the number of physicians appointed on the commission being increased in proportion to the population of the county in which the proceedings are pending, the statute directing, where the population is 50,000 or over, each member of said commission shall be a physician—the law also containing a general clause that in any county as many of the commissioners shall be physicians as the county judge can obtain, regardless of population. The county judge administers an oath to each commissioner to make due investigation into the allegations of the affidavit, and the commission is then organized by electing one of its members as the chairman thereof, empowering a majority of the commission to fix the time and place of hearing, with notification to the county attorney, who represents the person making the affidavit, and to the respondent's attorney, selected by him, or in lieu thereof to be appointed by the county judge.

"The commission need not remain together at any time, but a majority of same must be present at the hearing of any testimony, * * * but each member of said commission shall personally examine the respondent."

Each member has the power to administer oaths to witnesses, to have process issued by the clerk and to compel their attendance, and to punish said witnesses for contempt, "as is fully provided by law for the county court." It is required to conclude its investigation within ten days, and, as determined by a majority, shall file with the county clerk a report of its findings, which report, if insanity is found, is read to the respondent in the presence of a majority of the commission. The report shall state: (a) Whether or not the respondent is of unsound mind; and (b) if the respondent is of unsound mind, whether he should be placed under treatment for such mental condition; and (c) if he is of unsound mind, whether or not he should be placed under restraint.

---

If a majority of the commission find and report all three of the conditions mentioned above, the county judge pronounces judgment in the presence of the "respondent," as he is termed, adjudging him a lunatic and ordering him to be conveyed to an asylum of the state for restraint and treatment. The execution of this writ is, however, held in abeyance until the county judge is notified by the superintendent of asylums of a vacancy, and that the patient can be accommodated in one of the asylums of the state:

"Provided further, however, that the person to whom such writ is directed shall not execute same. * * * If some persons execute and file with the county judge a bond to be fixed by the county judge, payable to the state of Texas, with two or more good and sufficient sureties, to be approved by the county judge, conditioned that the party giving such bond will restrain and take care of such lunatic and have such lunatic placed under the treatment for his mental condition so long, in all three instances, as his mental unsoundness continues, or until he is delivered back to the sheriff of the county of such adjudication for conveyance to a state lunatic asylum, or is delivered to the superintendent of one of the lunatic asylums of the state and writ obtained therefor, which bond shall be filed with and constitute a part of the records of the proceedings, and may be sued and recovered upon by any person injured in his own name."

The appellants allege that Robert Hazelwood was adjudged a lunatic in the county court of Potter county, under the provisions of this law; that when he was under restraint, preliminary to his conveyance to an asylum, the appellees executed the · bond mentioned for the purpose of releasing him from such restraint and from the execution of the judgment (we assume, subject to the stipulations in the bond); that while at liberty he committed a murderous assault upon Mrs. Loving, one of the appellants herein, inflicting painful and permanent injuries and ensuing mental anguish—the appellants praying for a recovery upon the bond, for the sum of $1,000, the full penalty therein.

The district judge of Potter county sustained a general demurrer to this petition, and appellees endeavor to vindicate this action, by asserting the unconstitutionality of said statute, upon two grounds: (1) That it is in violation of the Bill of Rights (article 1, § 15), providing that "the right of trial by a jury shall remain inviolate;" and (2) that it brooks the due process clauses of the state and federal Constitutions, in that the tribunal as constituted is not competent, within the meaning of the organic law, to deprive a person of his liberty, and neither does the statute provide for adequate notice.

[1] We think the following analysis and résumé by appellees, upon investigation, is correct:

"Section 13, art. 4, Texas Constitution of 1836, provided that the Congress of the Republic should, as soon as practicable, put into effect the common law of England. By an act of the Congress of the Republic of December 20, 1836 (Laws 1836–37, p. 148), the Chief Justice of the county court was authorized to hold a probate court and to appoint guardians for lunatics. That by section 26 of that act, an appeal was given from all decisions of the probate to the district court; and that by section 41 of the same act, the courts of Texas were required to follow the common law of England in reference to injuries and evidence when not in conflict with some other law enacted by Congress; that sections 31 to 33, the District Court Act of December 22, 1836 (Laws 1836–37, p. 207) provided for the drawing of juries and shows that the trial of cases by jury in the district court was considered as a matter of course. That the probate act of February 5, 1840 (Laws 1840, p. 110), contained a provision (section 43) giving the right of appeal from all probate decisions to the district court, and provided, in effect, that there should be a trial de novo in the district court; that this condition existed until the act of March 20, 1848, which gave the Chief Justice of the county court power to summon a jury in the first instance to try a lunacy case and so remained until February 5, 1858 (Acts 7th Leg. c. 93), when practically the identical provision was incorporated by section 8 in an act of that date, organizing an asylum, and that this continued in effect until the Constitution of 1876 was ratified."

It may be there was no provision for a jury in a lunacy case in the county court in the first instance until the act of March 20, 1848, but there was a right of appeal to the district court, where a trial by jury could be had.

The case of Cockrill v. Cox, 65 Tex. 669, was one where the county judge, on account of his disqualification to try a contest over the probate of a will, transferred the cause to the district court. The contestants demanded a jury over the protest of the proponents. The Supreme Court said:

"All the Constitutions of the Republic and state of Texas have reserved the right of trial by jury, in the same language. * * * A provision preserving the right of trial by jury, expressed in substantially the same language, it is said, is to be found in all the state Constitutions, and it has been uniformly construed to perpetuate the right in the cases in which it exists, under the laws in force and practice prevailing at the date of the adoption of the particular Constitution. Cooley on Constitutional Limitations, 506. Thus, when the Constitution of Michigan was adopted, a party in possession of land was entitled to a jury trial of a suit against him, involving a title. It was held that the Legislature could not deprive him of this right by authorizing his adversary to proceed against him by will to remove cloud. Tabor v. Cook, 15 Mich. 322. In Indiana, at the date of her Constitution, a party was entitled to have a jury assess the damages in condemnation proceedings, and this right was held to be inviolable. * * * The provision in the Constitution of 1876, that the right of trial by jury shall remain inviolate, must be considered as perpetuating the right in the cases, in which, at the date of its adoption, it had been so universally recognized and firmly established, as in the contest arising over the proof of wills."

If a jury trial in lunacy proceedings was a part of our judicial system at the time of the adoption of the Constitution of 1876, and if this act, providing for the appointment of a commission by the county judge (without the right of appeal to the district court where a jury could be had) in matters of lunacy,

abridges this right, such act is unconstitutional.

[2] Upon an analysis of this law, upon the question whether this commission constitutes a jury, and that its proceedings would constitute a jury trial, we observe that a quorum of the commission has the power to hold sittings, swear the witnesses, commit them for contempt, receive any evidence it desires, and thereupon its findings and report are final. When the judgment of the court is pronounced, based upon the findings and report, in the presence of the respondent, adjudging him a lunatic, and ordering him conveyed to an asylum, the mentality of the judge, as an act of discretion and judgment, has been as foreign to the proceedings as that of the clerk of the court when he enters the judgment upon the docket of the court. The judge's mission is a ministerial function without any participation in the proceedings, except as stated, and with no other alternative than to make the report of the commission the judgment of the court ordering the respondent to the asylum, without any judicial control whatever to vacate said judgment, and from which there is no appeal. While each member of the commission is required under the law to personally examine the respondent, any two members of said commission may absent themselves from any hearing or sitting, when testimony of the man's sanity or insanity is adduced. There is no privilege granted in the statute for the presence, or compulsory attendance, of the respondent required before the commission sitting as a board of inquiry, when in custody of the sheriff, unless you imply that such tribunals would always require such persons present as an orderly and proper presentation of his defense. If four constitute a quorum, it is easily discerned, in analyzing this law, that, if a commission has successive sittings, the members of the same, as a whole, may not be the same at any one hearing.

It is entirely possible, and probable, in some cases, for such a commission to have a division of opinion on entirely different evidence—some of the members having heard certain evidence and others different testimony. If the whole personnel need not remain the same at successive sittings, if a majority, or even the entire number, conclude to report that a respondent is insane and should be treated and confined, they can agree, some upon a certain character of testimony, and others upon testimony of an entirely different nature.

Relatives, or friends, who are anxious to incarcerate the respondent, or zealous in preventing it (whichever way their inclinations or interests lead them), could testify, some before one quorum and some before another, and, some of which testimony a portion of the commissioners may have never heard, according to the change in quorums. Some may not have heard any and join in a majority report relying upon their sole personal examination of the respondent, while in custody of the sheriff, and what the others might tell them of the testimony at the hearing. The quorum, actually hearing the testimony, may divide in opinion as to the sanity of the respondent, and the other two, not sitting, can favor one side, or the other, as their judgment, based upon a personal examination, would dictate.

In fact, this commission does not have to have any sitting. Where is the power to command otherwise? The county judge, after its organization, has no connection with this body, except to pronounce a judgment upon a finding of the whole or a majority thereof. Each member of this commission may make a personal examination of the respondent, and the next day the commission, or a majority, may report him insane, upon which the county judge must order him to an asylum. There is no contrary interdiction, as a compulsory duty, to prevent it. While each member has to examine the respondent, however, any two, at any different hearings, may absent themselves from the same; hence it is clearly implied that this personal examination by each of the members is not, necessarily, at a hearing when the commission is sitting as a tribunal.

"By the English chancery practice the court had no inherent and general jurisdiction over idiots and lunatics as it did of infants. * * * This special jurisdiction of the chancellor was exercised as follows: Some friend of the lunatic would address a petition to the chancellor personally, setting forth the fact that such person was a lunatic, thereupon the chancellor would issue a special commission, directing a judicial inquisition of the alleged lunacy, which was always tried by a jury. Upon the return of the commission and inquisition, if the party was found to be a lunatic the chancellor appointed a committee, whose duty it was to take charge of the person and property of the lunatic." Howard v. Howard, 87 Ky. 616, 9 S. W. 411, 1 L. R. A. 610; Buswell on Insanity, p. 35.

"At common law an insane person may be temporarily restrained without legal process, and if need be in an asylum, if his going at large would be dangerous to himself or to others, preliminary to the institution of judicial proceedings for the determination of his mental condition, and such a restraint does not violate any constitutional provision [citing authorities]. When, however, * * * the confinement is permanent in nature, the person thus confined is deprived of his liberty which, in order to be lawful, must be in pursuance of a judgment of a court of competent jurisdiction, after such person has had sufficient notice and an adequate opportunity to defend." In re Allen, 82 Vt. 371, 73 Atl. 1080, 26 L. R. A. (N. S.) 238. Also In re Phillips, 158 Mich. 155, 122 N. W. 554.

" 'Trial by a jury,' in the primary and usual sense of the term at common law and in the American Constitutions, is not merely a trial by a jury of twelve men before an officer vested with authority to cause them to be summoned and impaneled, to administer oaths to them and to the constable in charge, and to enter judgment and issue execution on their verdict; but it is a trial by a jury of twelve men, in the presence and under the superintendence of a judge empowered to instruct them on the law and to advise them on the facts (except on acquittal of

a criminal charge), to set aside their verdict if in his opinion it is against the law or the evidence. This proposition has been so generally admitted, and so seldom contested, that there has been little occasion for its distinct assertion." Capital Traction Co. v. Hof, 174 U. S. 13, 19 Sup. Ct. 585, 43 L. Ed. 877, 878.

The above opinion, in stating twelve men as constituting a jury, has reference of course to the common law on the subject where the number was not designated nor changed by law.

The El Paso court, in passing upon this question, and applying the case of Cockrill v. Cox, 65 Tex., supra, says:

"The right of trial by jury in lunacy inquisitions seems to have been one of 'the cases in which the right existed and had been uniformly and universally recognized and firmly established' by the statutes of the state at the time of the adoption of the present Constitution. * * * The Constitution does not in words guarantee the right of trial by jury in lunacy cases, and the right in such cases is one that comes in by interpretation and adoption, because by 'statutory provision and practice it had become established.'" White v. White, 183 S. W. 369, opinion rendered January 14, 1916, not yet officially published.

It is probably the rule that it is competent to deny to parties the privilege of a trial before a jury in a court of first instance, provided the right is allowed on appeal. Cooley on Constitutional Limitations (7th Ed.) p. 591.

The same author, in referring to a constitutional right of this character, says:

"The constitutional provisions do not extend the right; they only secure it in the cases in which it was a matter of right before."

Where secured, he further says:

"The party is therefore entitled to examine into the qualifications and impartiality of the jurors, and to have the proceedings public; and no conditions can be imposed upon the exercise of the right that shall impair its value and usefulness." Pages 590, 591.

There is no provision in this law, giving the right to respondent or his attorney, to challenge the qualifications of any commissioner, after having been appointed, on account of any interest, or of any bias, or prejudice, as to his propriety in serving upon the same.

It is clear that this body is not a jury, nor that the proceeding before it constitutes a jury trial, in accordance with a conception of the law of the land as applied to such subjects.

It is argued with some persuasiveness that, on account of the ministerial and perfunctory duty of the county judge, such a respondent is not tried by a court. Though the commission has some of the powers of a court, viz., the right to commit witnesses for contempt, which constitutes a judicial power inherent in all courts, and, in reality, its findings and report, stripped of form and looking to the substance, has a finality attached to it, with the county judge exercising only a ministerial function, in propounding the judgment thereupon; still, however, it lacks several essential elements, one of which particularly it had no jurisdiction to render, nor power to enforce, a judgment. Henderson v. Beaton, 52 Tex. 29, wherein the Supreme Court held the old Commission of Appeals not a court; Accousi v. Stowers Furniture Co., 83 S. W. 1105.

The Supreme Court of Michigan held that, by the term "courts," as used in the Constitution of Michigan (article 6, § 1), providing for the investiture of judicial power in the Supreme Court, in circuit, probate, and in justice courts, is meant a permanent organization for the administration of justice, and not those special tribunals occasionally called into existence by particular exigencies and that cease to exist with such exigencies. Bissell v. Heath, 98 Mich. 472, 57 N. W. 586.

If a person charged with insanity is entitled to a jury trial, and we think he is, and if such a commission, as constituted by the statute, is a mere appanage to the county court, whose proceedings are violative of that right, without the right of appeal to a court for a jury trial de novo, the law is unconstitutional. We think this law is void.

[3] On the question of the validity of the bond, Chief Justice Phillips held, in the case of Watkins v. Minter (Sup.) 180 S. W. 229, that the bond in that proceeding, though not in accordance with the statute, was good as a common-law obligation, for the reason that it was not executed in relation to a right which the defendants were entitled to exercise without the giving of a bond, and also that it was a voluntary obligation, supported by a sufficient consideration—the discharge of Claude Minter from custody. In that cause the sureties, in their obligation, outside the statute then in vogue, agreed to faithfully protect all animal and human life, and become responsible for all damages that may hereafter arise by reason of the acts of Minter, and it was said:

"Under these terms it is plain that a suit could be maintained on the bond * * * for the use of any one injured" by the negligence of the bondsmen.

The plaintiff sounds his case entirely upon the judgment of insanity, the execution of the bond, the tortious acts of Robert Hazelwood, and the failure to restrain him as a breach of the bond. This bond is merely payable to the state of Texas, conditioned that the parties will restrain the lunatic, take care of, and place him under treatment for his mental condition, so long as his mental unsoundness continues, "or until he is delivered back to the sheriff of the county * * * for conveyance to a state lunatic asylum, or is delivered to the superintendent of one of the lunatic asylums of the state and receipt obtained therefor." It is perforce of the statute, and not in the bond, that it "may be sued, and recovered upon, by any person injured, in his own name."

Justice Lipscomb said, in the case of Johnson v. Erskine, 9 Tex. p. 10:

"We believe that, if a bond, intended to be taken by the authority of a statute, cannot be sustained as a statutory bond, that it cannot

be valid as a common law, voluntary bond, unless it will stand as such, without the aid of the statute by which it has been repudiated."

See, also, Hillman v. Mayher, 38 Tex. Civ. App. 378, 85 S. W. 818, and cases cited.

Article 161, providing for the issuance of the writ, carrying into execution the judgment of lunacy, places the respondent in the custody of the sheriff for conveyance to a lunatic asylum—its execution suspended until a vacancy occurs. Such person is classed as a public patient, "adjudged insane, by a court of competent jurisdiction, * * * and ordered to be conveyed to the asylum." Section 1, article 134.

The bond prescribed by article 161 is to prevent the execution of the judgment and the writ in pursuance thereof, with the added feature of recovery thereupon "by any person injured."

[4] If the judgment and the writ are void, there is no final adjudication of lunacy, and the sheriff, of course, could not convey to the asylum, nor could the superintendent receive the respondent; neither could the bondsmen redeliver the respondent to the sheriff or to the superintendent for that purpose. If the judgment and the writ are void we think the bond is also void; and if you eliminate the statute wholly from the bond, which gives the right to any person injured to sue upon the same, it is merely an obligation to the state of Texas that the bondsmen will restrain Hazelwood and treat him for his mental unsoundness until they return him to the sheriff for conveyance to the asylum, or deliver him to the superintendent of the same.

The rules are rather familiar as to the right of a third person in equity to enforce a contract made for his benefit, though not a party thereof. Page on Contracts, vol. 3, §§ 1318, 1319. The case of Watkins v. Minter, where the bondsmen specifically obligated themselves to protect all human life "and become responsible for all damages that may hereafter arise by reason of the acts of * * * Claude Minter," falls into that class. The Supreme Court said:

"Being only a common-law obligation, the bond derives no aid from the statute. But its terms are such as to clearly render it enforceable without reference to the statute."

There are cases, of course, where a bond is void as a statutory bond, by reason of being made payable to the wrong person. A replevy bond, void as a statutory delivery bond, on account of being payable to the officer instead of to the plaintiff in execution, is a valid common-law obligation, because the sureties become liable for the payment of the debt to the extent of the value of the property which has been surrendered; the proceedings show the beneficiary of the bond. Jones v. Hays, 27 Tex. 1; also see Bank v Lester, 73 Tex. 543, 11 S. W. 626.

In San Francisco Lumber Co. v. Bibb, 139 Cal. 192, 72 Pac. 964, it was held that a bond given to secure a building contract and executed in pursuance of a void section of a particular statute, which made the bond expressly inure to the benefit of all persons who perform labor for or furnish materials to the contractor, is wholly void and could not be sustained as a common-law bond.

It is said, however, in the case of Stevenson v. Morgan, 67 Neb. 207, 93 N. W. 180, 108 Am. St. Rep. 629, that if a bond is executed in pursuance of a statute declared unconstitutional, and rests upon a consideration independent of the statute, it may be enforced as a common-law obligation.

If an instrument rests partially upon a void consideration and partially upon a good consideration, if you are unable to sever the consideration as actuating the promisor, the whole instrument is void. Clark on Contracts, p. 473. The bondsmen in this instance would have the right and privilege, if the instrument and the writ were valid, to deliver Hazelwood to the superintendent of the asylum; if invalid, that right is destroyed. If this bond cannot be aided by the statutory provision permitting some third person to sue and recover upon it, we do not think the instrument on the face of it, under the case made gives the right, nor can it be implied from its terms that any third person has any beneficial right of enforcement on account of its breach; hence we think the cause could not be maintained on the bond.